IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION/IBT,<br><br>Plaintiff,<br><br>vs.<br><br>BNSF RAILWAY COMPANY,<br><br>Defendant. | 8:13-CV-249<br><br>MEMORANDUM AND ORDER |

    This matter is before the Court on Defendant's Motion for a Preliminary Injunction (filing 8). After fully reviewing the evidence and the parties' arguments, the Court finds that the plaintiff labor union is threatening to take action which would violate the Railway Labor Act, 45 U.S.C. § 151 *et seq*. Therefore, the Court finds both jurisdiction and grounds to enjoin the plaintiff from doing so. The defendant's motion will be granted.

## BACKGROUND

    Most of the relevant facts are undisputed. The Brotherhood of Maintenance of Way Employes Division of the International Brotherhood of Teamsters (the Brotherhood) is a labor union representing employees of the BNSF Railway Company (BNSF) working as maintenance of way employees. Filing 31 at 1. BNSF is a Class I rail carrier that was formed through the combination of several former railroads, including the former Burlington Northern (BN). Filing 31 at 1. BNSF and the Brotherhood are parties to several collective bargaining agreements (CBAs), including a 1982 "schedule agreement" that was republished in 2002. Filing 31 at 2.

    This case concerns a 120-mile rail line in northeast Nebraska (the "NENE line") that had previously been owned by BN. Filing 31 at 2. The NENE line was listed in the 1982 CBA. Filing 31 at 2. The NENE line was sold to the Nebraska Northeastern Railroad, a short line operator, in 1996. Filing 31 at 2. On July 19, 2013, BNSF entered into a purchase and sale agreement with Nebraska Northeastern to acquire and operate the NENE line. Filing 31 at 2. BNSF filed a petition with the Surface Transportation Board seeking to exempt the NENE line acquisition from the requirements of

49 U.S.C. § 11323 *et seq.*, which requires certain railroad transactions to be preapproved by the Board. Filing 31 at 2-3. The Board granted the petition, conditioned on the acceptance of certain employee protections set forth in *New York Dock Railway—Control—Brooklyn Eastern District Terminal*, 360 I.C.C. 60 (1979) (*New York Dock*), *aff'd sub nom. New York Dock Ry. v. United States*, 609 F.2d 83 (2d Cir. 1979), and *Wilmington Terminal Railroad—Purchase & Lease—CSX Transp., Inc.*, 6 I.C.C.2d 799, 814-26 (1990) (*Wilmington Terminal*). Filing 31 at 3.

The sale closed on December 4, 2012. Filing 31 at 3. On December 17, BNSF notified the Brotherhood, pursuant to *New York Dock*, that it intended to integrate the NENE line's operations into BNSF's operations and to negotiate an implementing agreement with the Brotherhood. But BNSF and the Brotherhood failed to reach an agreement. The Brotherhood asked that the National Mediation Board appoint an arbitrator to determine the terms of an implementing agreement. Filing 31 at 3. Thereafter, BNSF informed the Brotherhood that it was withdrawing the integration proposal and would continue to operate the NENE line as a stand-alone operation. Filing 31 at 3-4.

At the time of the sale, NENE had 14 employees, 4 of whom performed maintenance of way work. Filing 31 at 2. Most of the NENE employees affected by the transaction chose to accept jobs offered by BNSF. Filing 31 at 3. Those employees are now performing maintenance of way work on the NENE line using BNSF equipment, but are not performing maintenance of way work for BNSF beyond the NENE line. Filing 31 at 3. BNSF is applying the rates of pay, rules, and working conditions that existed on the NENE line before the sale to employees currently working on the line. Filing 31 at 4. The Brotherhood contends BNSF should be applying the rates of pay, rules, and working conditions set forth in the operative CBAs between the Brotherhood and BNSF. BNSF disagrees, and contends that it is permitted to apply the terms and conditions from before the sale. Filing 31 at 4.

On August 16, 2013, the Brotherhood filed this action against BNSF, alleging violations of the Railway Labor Act. Filing 1. On August 26, the Brotherhood informed BNSF that it would exercise "self-help" (i.e., strikes or other economic force) over the dispute within 10 days unless BNSF ceased what the Brotherhood described as a unilateral change to the CBAs. Filing 31 at 4-5. But BNSF, describing its actions as permissible under the CBAs and *New York Dock*/*Wilmington Terminal* conditions, invoked arbitration under *New York Dock*. Filing 31 at 4-5. Then, on September 4, BNSF filed the motion currently before the Court, asking the Court to enjoin the Brotherhood from a strike or any other form of self-help. Filing 8. After

briefing and a hearing on September 25, BNSF's motion was submitted for disposition.

## DISCUSSION
### STATUTORY BACKGROUND

This case sits at the wye of three different statutory schemes: the Norris-LaGuardia Act (Norris-LaGuardia), 29 U.S.C. § 106 *et seq*.; the Interstate Commerce Act, 49 U.S.C. § 10101 *et seq*. (ICA); and the Railway Labor Act (RLA).

Norris-LaGuardia expresses a basic policy against the injunction of activities of labor unions. *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 437 (1987). Specifically, as relevant, Norris-LaGuardia provides that "[n]o court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute" from "[c]easing or refusing to perform any work or to remain in any relation of employment . . . ." 29 U.S.C. § 104. In other words, Norris-LaGuardia generally precludes the Court from enjoining a strike.

The ICA regulates rail transactions such as a rail carrier's abandonment of a rail line, transfer of that line to another carrier, or transfer of that line to a non-carrier. *See Redden v. I.C.C.*, 956 F.2d 302, 303 (D.C. Cir. 1992). The ICA provides that the sale of active rail lines is subject to the prior approval of the Surface Transportation Board.[1] *See*, 49 U.S.C. § 10901; *Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R. Co.*, 596 F.3d 1217, 1220 (10th Cir. 2010). To protect employees adversely affected by such sales, the Surface Transportation Board may impose the protective conditions set forth in *New York Dock* and later clarified in *Wilmington Terminal*. *CSX Transp., Inc. v. United Transp. Union*, 86 F.3d 346, 348 (4th Cir. 1996); *Redden*, 956 F.2d at 304-05. Those conditions are intended to meet the requirement "that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction

---

[1] The ICC Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 803 (1995), substantially deregulated rail and motor carrier transportation, abolished the Interstate Commerce Commission, and transferred the motor carrier regulatory functions formerly performed by the Interstate Commerce Commission to the Department of Transportation and the Surface Transportation Board. *See*, 49 U.S.C. § 13501; *GS Roofing Prods. Co., Inc. v. Surface Transp. Bd.*, 262 F.3d 767, 771 n.1 (8th Cir. 2001); *Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 192 F.3d 778, 780-81 (8th Cir. 1999). For purposes of the regulatory scheme at issue, the functions of the Surface Transportation Board and the former Interstate Commerce Commission are essentially interchangeable.

during the 4 years following the effective date" of the Surface Transportation Board's final action. *See*, 49 U.S.C. § 11326(a); *CSX Transp., Inc.*, 86 F.3d at 349.

Among other things, *New York Dock* provides for negotiations between the railroad and its unions for the purposes of reaching agreement with respect to the terms and conditions of the labor protective compact. *CSX Transp., Inc.*, 86 F.3d at 349 (citing *New York Dock,* 360 I.C.C. at 77). If no agreement is reached by the end of this period, either party may request arbitration; the parties are then called upon to select an arbitrator and if they cannot agree upon one, the National Mediation Board shall appoint one. *Id.* (citing *New York Dock,* 360 I.C.C. at 78). The arbitrator then has 30 days after the hearing to render a "final, binding, and conclusive" decision. *Id.* (citing *New York Dock,* 360 I.C.C. at 78).

> Section [11326] and *New York Dock* seek to achieve a balance between the interests of labor and management. Labor receives guaranteed wage protections while management benefits by avoiding a strike. The avoidance of strikes is crucial to the public interest in maintaining the nation's transportation system. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern. While both sides may thus contest the particulars of a proposed implementing agreement before an arbitrator, the arbitrator's final, binding, and conclusive decision prevents either the union or the railroad from holding the nation's transportation system hostage to its aims.

*CSX Transp., Inc.*, 86 F.3d at 349 (citations and quotations omitted).

The RLA also obligates unions and employers to negotiate disputes. *United Transp. Union v. Kansas City Southern Ry. Co.*, 172 F.3d 582, 585 (8th Cir. 1999); *Sheet Metal Workers' Int'l Ass'n v. Burlington N. R.R. Co.*, 893 F.2d 199, 202 (8th Cir. 1990). If negotiation fails, the dispute takes one of two courses, depending upon whether the dispute is characterized as "major" or "minor." *United Transp. Union*, 172 F.3d at 585; *Sheet Metal Workers*, 893 F.2d at 202. Minor disputes follow an administrative resolution process, and the parties must submit their differences to the National Railroad Adjustment Board for final arbitration. *United Transp. Union*, 172 F.3d at 585. (citing 45 U.S.C. § 153(i)); *Sheet Metal Workers*, 893 F.2d at 202. While that arbitration is pending, the carrier may apply its reasonable interpretation of the disputed agreement, and the union may not strike. *Bhd.*

*Ry. Carmen v. Mo. Pac. R.R. Co.*, 944 F.2d 1422, 1427 (8th Cir. 1991). Conversely, in major disputes, the parties are obliged to maintain the status quo while they pursue a lengthy, almost interminable process of bargaining and mediation. *United Transp. Union*, 172 F.3d at 585; (citing *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 302 (1989)); *Carmen*, 944 F.2d at 1427; *Sheet Metal Workers*, 893 F.2d at 202. But when the required procedures for resolving a major dispute have been exhausted and no agreement has been reached, the parties may resort to the use of economic force. *Carmen*, 944 F.2d at 1427 (citing *Consol. Rail Corp.*, 491 U.S. at 303); *see also Mo. Pac. R.R. Co. v. United Transp. Union*, 782 F.2d 107, 110-11 (8th Cir. 1986).

These statutes do not always coexist easily. While Norris-LaGuardia generally prevents the federal courts from enjoining labor union activity, the prohibition of Norris-LaGuardia must give way when necessary to enforce a duty specifically imposed by another statute. *Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs. Ass'n*, 491 U.S. 490, 514 (1989). Thus, the ICA may supersede Norris-LaGuardia, such that a court may enjoin a strike threatened in violation of the ICA. *See Mo. Pac. R.R. Co.,* 782 F.2d at 111-12; *see also CSX Transp., Inc.*, 86 F.3d at 349-50 (citing *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 251 (1970)). A court may also issue injunctions to enforce compliance with the RLA notwithstanding Norris-LaGuardia. *Pittsburgh & Lake Erie R.R. Co.*, 491 U.S. at 513 (citing *Trainmen v. Chicago River & Ind. R.R. Co.*, 353 U.S. 30, 41-42 (1957)). And in some instances, the ICA can supersede the RLA. *See*, *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 132-33 (1991); *Norfolk & W. Ry. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 853 (4th Cir. 1998).

It is important to recognize that the issue before the Court is narrow: whether the Brotherhood should be enjoined from self-help using economic force. The Court is not faced, at this juncture, with deciding what dispute resolution procedures should be followed by the parties. If the Brotherhood's threatened self-help would violate either the ICA or the RLA, then it should be enjoined. And neither party contends that in this case, the ICA supersedes the RLA. BNSF argues that the Brotherhood's threatened use of economic force would violate both the ICA and the RLA, and offers both acts as coequal alternatives to supersede Norris-LaGuardia and support an injunction. The Brotherhood, on the other hand, contends that the ICA is inapplicable, and that BNSF, not the Brotherhood, is violating the RLA. In other words, the parties agree that the RLA is applicable here, although each accuses the other of violating it.

MAJOR OR MINOR DISPUTE UNDER RLA

Under the RLA, a dispute is classified as either major, involving the creation of new contractual rights, or minor, involving the interpretation and enforcement of existing CBAs.[2] *Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe Ry.*, 270 F.3d 637, 638-39 (8th Cir. 2001); *see also Carmen*, 944 F.2d at 1426. The distinction is important when establishing jurisdiction because, as noted above, minor disputes must be submitted to binding arbitration. *Bhd. of Maint. of Way Emps.*, 270 F.3d at 639; *see also Mo. Pac. R.R. Co.*, 782 F.2d at 110.

There is no bright line rule for differentiating between major and minor disputes. *United Transp. Union*, 172 F.3d at 585-86. In general, major disputes seek to create contractual rights, while minor disputes seek to enforce them. *Id.* at 586. In other words, the question is whether the dispute evolves from the bargaining process for a new or altered contract, or whether it is over the meaning of an existing CBA. *Mo. Pac. R.R. Co.*, 782 F.2d at 111. The distinction rests on whether the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. *Carmen*, 944 F.2d at 1427.

Major disputes involve questions relating to the formation of, or efforts to secure, labor agreements. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past. *United Transp. Union*, 172 F.3d at 586. For instance, a dispute is major if one party seeks to change the rates of pay, rules, or working conditions in a manner not contemplated by the CBA. *Sheet Metal Workers*, 893 F.2d at 202. They arise where there is no such agreement, or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. *Id.* (citing *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723 (1945)).

In contrast, minor disputes involve the interpretation of existing agreements. *United Transp. Union*, 172 F.3d at 586. They contemplate the existence of a collective bargaining already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. *Sheet Metal Workers*, 893 F.2d at 202 (citing *Burley*, 325 U.S. at 723). Characterizing the nature of the dispute depends on whether it is arguably comprehended within the agreement of the parties. *United Transp. Union*, 172 F.3d at 586. "The distinguishing feature of such a

---

[2] The terms "major" and "minor" do not appear in the RLA itself; they are judicially created nomenclature. *United Transp. Union*, 172 F.3d at 585 n.1; *Sheet Metal Workers*, 893 F.2d at 202 n.2. They are simply a "shorthand method of describing two classes of controversy Congress had distinguished in the RLA." *Consol. Rail Corp.*, 491 U.S. at 302.

case is that the dispute may be conclusively resolved by interpreting the existing agreement." *Consol. Rail Corp.*, 491 U.S. at 305. In other words, a minor dispute does not involve rights that exist independent of the CBA. *Bhd. of Maint. of Way Emps.*, 596 F.3d at 1223 (citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994)).

In determining whether a dispute is major or minor, the Court must determine the terms of the agreement, including the written CBA and the parties' past practices. *United Transp. Union*, 172 F.3d at 586. It is important to stress, however, that the Court need not interpret the terms of the agreement. *Id.* The purpose of the inquiry, rather, is to determine whether the case implicates a question of contract interpretation. *Id.*; *Carmen*, 944 F.2d at 1427. And once the Court determines the terms of the agreement, it must then determine whether the particular dispute is comprehended within that agreement. *United Transp. Union*, 172 F.3d at 586.

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

*Consol. Rail Corp.*, 491 U.S. at 307; *Carmen*, 944 F.2d at 1427.

In this case, the Brotherhood does not dispute that the parties' disagreement is controlled by the existing CBA. Indeed, the Brotherhood expressly argues that BNSF has violated the RLA by *refusing* to apply the CBA to the NENE line. Filing 18 at 29. Instead, the Brotherhood claims that BNSF's contrary interpretation of the CBA is frivolous or obviously insubstantial. Therefore, the Brotherhood asserts, BNSF is in effect attempting to unilaterally impose new contractual terms, and the dispute is major. *See Consol. Rail Corp.*, 491 U.S. at 306-07. So, the Brotherhood contends, because BNSF has failed to proceed with the RLA's major dispute resolution procedures, it is precluded by Norris-LaGuardia from seeking relief from the threatened strike. *See Burlington N. R.R. Co. v. United Transp. Union*, 862 F.2d 1266, 1282 (7th Cir. 1988).

The issue, then, is whether BNSF's reliance on the CBA can be reasonably justified. Formulations of this inquiry have differed over time and among the circuits: phrases such as "not arguably justified," "obviously insubstantial," "spurious," and "frivolous" have been employed. *United Transp. Union*, 172 F.3d at 586; *see also Sheet Metal Workers*, 893 F.2d at 203. For example, a case is deemed minor if the railroad's assertion that the dispute implicates a question of contract interpretation is not obviously

insubstantial. *United Transp. Union*, 172 F.3d at 586. The differences between these formulations are not critical; each illustrates the relatively light burden which the railroad must bear in establishing exclusive arbitral jurisdiction under the RLA. *Id.*; *see Consol. Rail Corp.*, 491 U.S. at 306-07.

In support of its argument that BNSF's construction of the 2002 CBA is frivolous or obviously insubstantial, the Brotherhood points to Rule 1, which describes the scope of the CBA as including "the hours of service, rates of pay and working conditions of all employes not above the rank of track inspector, track supervisor and foreman, in the Maintenance of Way and Structures Department . . . ." Filing 25-3 at 2. The Brotherhood also points to Rule 6, which sets forth seniority districts; the Lincoln Seniority District expressly includes "Iowa Ferry to O'Neil[,]" which can only be a geographical description of the NENE line. Filing 25-3 at 9.

BNSF contends, on the other hand, that the 2002 CBA, despite the broad language of Rule 1, only applies to the former BN portion of BNSF. Filing 22 at 23 (citing filing 25-1 at 2). And BNSF argues that the reference to "Iowa Ferry-O'Neil" in the 2002 CBA, which was carried over from the 1982 CBA, could not have been intended in 2002 to cover the NENE line because at the time, the NENE line was not owned by BNSF. Filing 22 at 24. BNSF points out that the 2002 CBA contains a number of references to lines that BNSF no longer owns, and that those references "become defunct once a line is sold." Filing 22 at 24. BNSF also points to a map that was included with the 2002 CBA that does not include the NENE line. Filing 9-2 at 100.

The Brotherhood denies the relevance of the map, asserting that nothing in the CBA incorporates the map. But the Court's task is not to decide which party's interpretation of the CBA is more persuasive. It is only to decide whether BNSF has met its relatively light burden of showing that its reading of the CBA is arguably justified. *See Bhd. of Maint. of Way Emps.*, 596 F.3d at 1223 (citing *Consol. Rail Corp.*, 491 U.S. at 307). And, the Court notes, if doubt arises about the classification of a dispute, the dispute is considered to be minor. *Bhd. of Maint. of Way Emps.*, 270 F.3d at 639; *see also United Transp. Union*, 172 F.3d at 588.

In this regard, the Court finds the Eighth Circuit's decision in *Sheet Metal Workers* to be particularly instructive. In that case, the scope clause of the operative CBA broadly provided that union employees were entitled to perform the sheet metal work on all locomotives leased or purchased by BN. *Sheet Metal Workers*, 893 F.2d at 204. But non-union employees at a wholly owned subsidiary were used to maintain and repair locomotives used by BN pursuant to an agreement by which BN paid the locomotives' owner at a rate determined by the amount of electrical power generated by the locomotives. *Id.* at 200-01. BN argued that because the locomotives were neither "leased"

nor "purchased," they were not covered by the scope clause of the CBA, and a subsidiary could repair and maintain the locomotives because the CBA did not expressly prohibit it. *Id.* at 204.

The Eighth Circuit found that the dispute over maintenance and repair of the locomotives was minor, because BN's interpretation of the contract, "however improbable it may be," was "nonetheless plausible." *Id.* at 205. The Eighth Circuit explained that while the union's "argument may ultimately prove to be well taken," the court's task was simply to determine whether BN's position was arguable. *Id.* at 204. Because the dispute was "arguably comprehended within the parties' agreement[,]" the court found that the dispute was minor and thus subject to arbitration. *Id.* at 205.

The same is true here. The facts of this case are peculiar, and neither party has identified a case that the Court finds to be particularly analogous. That weighs in BNSF's favor: there is little precedent to inform the interpretation of a contract where a line is included in a CBA between a union and a railroad, the line is sold, the language in the CBA referring to the line is nonetheless carried over into a new CBA between the union and a corporate successor, and the line is then reacquired by the successor railroad. BNSF's understanding of how the CBA applies to such unusual circumstances is, the Court finds, neither frivolous nor obviously insubstantial. The fact that BNSF's contract interpretation may be questionable—and might even be wrong—does not make it frivolous. *Id.* at 205.

The Court finds that the parties' dispute is minor, and subject to arbitration under the RLA. Having reached that conclusion, the Court need not consider the ICA or its relationship with the RLA or Norris-LaGuardia under these circumstances. *See Gen. Comm. of Adjustment v. CSX R.R. Corp.*, 893 F.2d 584, 594 n.12 (3d Cir. 1990).

STANDARD FOR INJUNCTIVE RELIEF

When deciding whether to issue a preliminary injunction, the Court generally turns to the four *Dataphase* factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on the nonmovant and other parties; and (4) the public interest. *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). That said, it is not entirely clear to what extent those factors apply when a railroad seeks to enjoin a union from exercising self-help over a minor dispute under the RLA. *See, Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus.*, 399 F.3d 89, 95-96 and n.3 (1st Cir.

2005); *Nat'l Ry. Labor Conference v. Int'l Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741, 749-50 (7th Cir. 1987); *cf. Chicago River*, 353 U.S. 30; *but cf.*, *Boys Markets*, 398 U.S. at 254-55; *Bhd. of Locomotive Engineers v. Mo.-Kan.-Tex. Ry. Co.*, 363 U.S. 528, 531 (1960). The Court need not resolve that question, because the Court finds that the *Dataphase* factors weigh in favor of injunctive relief in any event.[3]

First, BNSF has shown a likelihood of success on the merits, on the rather unusual basis that the Court lacks subject-matter jurisdiction over the merits of the Brotherhood's complaint. Because this is a minor dispute, it must be resolved through arbitration, and the Court lacks jurisdiction over the substance of the Brotherhood's argument regarding construction of the CBA. *See Bhd. of Maint. of Way Emps.*, 270 F.3d at 639. BNSF is therefore likely to "succeed" on the merits at least to the extent that the Brotherhood's claims are likely to be dismissed. *Cf. Brady v. Nat'l Football League*, 640 F.3d 785, 789-92 (8th Cir. 2011).

BNSF's argument regarding the threat of irreparable harm to the railroad, and its argument about the public interest, substantially overlap. BNSF presented evidence describing, in detail, the effect that the Brotherhood's threatened strike would have on its operations, and the larger economic effects that would result from the disruptions to BNSF. Filing 9-2 at 4-7. The Court need not recite that evidence in detail, because it is not substantially disputed by the Brotherhood; it suffices to say that any significant interruption of traffic on a railroad the size of BNSF is likely to inflict significant, unpredictable, and irreparable harm on BNSF and the public at large.

---

[3] The Brotherhood throws one more argument into a footnote; commensurate with the Brotherhood's assessment of the importance of its point, the Court will answer with a footnote of its own. The Brotherhood argues that BNSF should be denied injunctive relief because it has failed to exhaust its administrative remedies by actually referring this dispute to arbitration before the National Railroad Adjustment Board. *See* filing 18 at 60 n.12 (citing *Itasca Lodge 2029 v. Ry. Express. Agency Inc.*, 391 F.2d 657 (8th Cir. 1968)). The Court rejects the Brotherhood's argument for two reasons. First, even in *Itasca Lodge 2029*, the Eighth Circuit affirmed the district court's temporary injunction of a work stoppage pending the railway's submission of the dispute to the National Railroad Adjustment Board. 391 F.2d at 669. Second, the record establishes that BNSF has submitted this dispute for arbitration, albeit under *New York Dock* instead of the RLA. Filing 23-1. This, the Court finds, is sufficient to satisfy BNSF's obligation to "make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." *See* 29 U.S.C. § 108; *see also Aircraft Mechs. Fraternal Ass'n v. Nw. Airlines Corp.*, 394 F. Supp. 2d 1082, 1089 n.6 (D. Minn. 2005).

Rather than disputing the factual details associated with the effects of a work stoppage, the Brotherhood argues that "an injunction will prevent BMWED from responding to BNSF's exercise of self help by its own exercise of self help, a response that is permitted by the RLA and [Norris-LaGuardia]." Filing 18 at 59. Obviously, the Court disagrees. And the Brotherhood falls back on the third *Dataphase* factor, the balance of harms, contending that BNSF "fails to explain how the harm to [the Brotherhood] and its members will be fully remedied if a strike is enjoined based on BNSF's minor dispute argument and BNSF's position is ultimately rejected in arbitration." Filing 18 at 59-60. That argument would be more compelling if the supposed harm to the Brotherhood had been more fully explained.

The Court recognizes that the burden of establishing the propriety of an injunction is on the movant. *Roudachevski*, 648 F.3d at 705. But it is difficult for the Court to credit the Brotherhood's argument in the absence of a meaningful, concrete articulation of *how* it and its members are being harmed. The inchoate assertion of "the harm done to the union and all of its members by abrogation of the Agreement and BNSF's bad faith in dealing with [the Brotherhood] on this issue[,]" filing 18 at 60, is unpersuasive; it essentially describes a breach of contract, for which money damages are generally considered sufficient.[4] "In most cases where the [National Railroad Adjustment] Board determines that the employer's conduct was not justified by the contract, the Board will be able to fashion an appropriate compensatory remedy which takes account of the delay." *Consol. Rail Corp.*, 491 U.S. at 310 n.8. The Brotherhood has identified nothing in this case that is inconsistent with that general principle.

Nor is the Court persuaded by the Brotherhood's argument that the public interest would not be served by an injunction, because the public interest also includes the policies served by the RLA and Norris-LaGuardia. Even if those policy interests were cognizable under *Dataphase*, the Court has already rejected the Brotherhood's legal argument regarding the applicability of those statutes in this case. The Court finds that when the *Dataphase* factors are considered, they weigh in favor of injunctive relief.

## CONCLUSION

In sum, the Court finds that the parties' dispute here is minor within the meaning of the RLA. As such, a strike would violate the RLA and may be enjoined by the Court notwithstanding the provisions of Norris-LaGuardia. *Mo. Pac. R.R. Co.*, 782 F.2d at 110. And, in fact, such an injunction is

---

[4] The Brotherhood has not asked for security pursuant to Fed. R. Civ. P. 65(c); nor does the Court see any basis for ordering it at this point.

- 11 -

necessary to give effect to the grievance machinery of the RLA. *See Bhd. of Locomotive Engineers v. Louisville & N. R. Co.*, 373 U.S. 33, 41-42 (1963). Furthermore, BNSF has shown that the *Dataphase* factors weigh in favor of issuing a preliminary injunction. Therefore, the Court will grant BNSF's motion for preliminary injunction (filing 8).

IT IS ORDERED:

1. Defendant's Motion for a Preliminary Injunction (filing 8) is granted.

2. The Brotherhood, and its officers, agents, employees, and members, are preliminarily enjoined from initiating or participating in any strike, work stoppage, or other self-help intended to interfere with BNSF's normal operations, pending a final judgment in this case.

Dated this 16th day of October, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge